# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VAXCEL INTERNATIONAL CO., LTD., <br><br>       Plaintiff, <br><br> and <br><br> NORTH TECH INTERNATIONAL CO., LTD., <br><br>       Counterclaimant in Intervention, <br><br> v. <br><br> HEATHCO LLC, <br> LOWE'S COMPANIES, INC., and <br> LOWE'S HOME CENTERS, LLC, <br><br>       Defendants/Counterclaim Defendants. | Civil Action No. 1:15-cv-00696 <br><br> The Honorable John R. Blakey <br><br> Magistrate Judge Mary M. Rowland |

## DEFENDANTS' FINAL INVALIDITY AND UNENFORCEABILITY CONTENTIONS

Pursuant to Local Patent Rule ("LPR") 3.1, Defendants HeathCo LLC ("HeathCo"), Lowe's Companies, Inc. ("LCI"), and Lowe's Home Centers, LLC ("LHC") (together, "Defendants") hereby serve their Final Invalidity And Unenforceability Contentions. These Final Invalidity And Unenforceability Contentions are responsive to Plaintiff Vaxcel International Co. Ltd.'s ("Vaxcel" or "Plaintiff") Covenant Not To Sue, dated December 14, 2015 regarding all claims except claim 7. As such, these Final Invalidity And Unenforceability Contentions only address claim 7 of U.S. Patent No. 8,310,163 ("the '163 patent"). (*See also* ECF No. 106.)

Plaintiff has asserted that Defendants infringe claim 7 of the '163 patent ("the Asserted Claim"). Defendants deny that they infringe the Asserted Claim. In addition, the Asserted Claim is invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112, and unenforceable due to inequitable conduct during prosecution of the application that led to the '163 patent.

The Asserted Claims are invalid on the following grounds:

The Asserted Claim is invalid under 35 U.S.C. § 101, which the Supreme Court has interpreted to bar the issuance of patents on "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). The Asserted Claim claims novelty in the fact that "the zero-crossing-point time-delay pulse lags with a time difference behind the edge of the symmetric square-wave, wherein the said time difference ranges from $(t_o)$ to $(1/(2f)-t_o)$, wherein $t_o=(1/2\pi f)\sin^{-1}(V_t/V_m)$, f is frequency of the AC power, $V_m$ is voltage amplitude of the AC power and $V_t$ is threshold voltage for the electric current flowing in the lighting load." (*See, e.g.*, HEATH000127.) However, the equation for $t_o$ is nothing more than the equation that calculates a time from the last zero-crossing-point to the time for any given voltage $(V_t)$ along the sine wave generated by AC current. That is, $t_o$ is determined entirely by the mathematics of sine waves created by AC generators. Mr. C.T. Chen, the named inventor of the '163 patent, admitted that this is the case during his deposition: "Put it in very simple way. It's a conversion between how AC power is generated and then transform into a time phase, two-dimensional time phase, with XY voltage and time change in voltage. It's just a conversion equation." (C.T. Chen Dep. Tr. 112:7–12.) Similarly, the claimed range of $(t_o)$ to $(1/(2f)-t_o)$ is nothing more than the range along the sine wave where the voltage is greater than any given selected voltage $V_t$. (*See, e.g.*, C.T. Chen Dep. Tr. 112:13–113:20.) Because one cannot patent a mathematical concept, the Asserted Claim of the '163 patent is invalid under § 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355–56 (2014).

Based on Plaintiff's Preliminary Infringement Contentions asserting that the SH-5105-BZ infringes the Asserted Claim, the Asserted Claim is invalid under §§ 102(a) and (b) based on HeathCo's public use and/or sale to Lowe's of HeathCo Model No. 4192 devices and numerous

2

other models having the same basic circuit and functionality ("the DualBrite Prior Art") since at least August 7, 2008. (*See, e.g.*, HEATH001486–90; *see also* HEATH000143; HEATH001484–85; HEATH002423–58.) *Vanmoor v. Walmart Stores, Inc.*, 201 F.3d 1331 (Fed. Cir. 2000). Defendants incorporate by reference their Motion for Summary Judgment and supporting documentation, which further detail Defendants' contentions. (ECF Nos. 76–90.)

HeathCo's public use and/or sale of the DualBrite Prior Art also renders the Asserted Claim obvious by itself in light of the knowledge of a person skilled in the art and/or in light of the prior art, including, but not limited to:

- U.S. Patent No. 7,086,756 ("Maxik") (HEATH002499–511);
- U.S. Patent No. 7,296,913 ("Catalano") (HEATH002482–98);
- U.S. Patent No. 7,344,275 ("Allen") (HEATH014438–68);
- U.S. Patent No. 7,450,095 ("Yu") (HEATH014469–74);
- U.S. Patent No. 7,564,198 ("Yamamoto") (HEATH014475–91);
- U.S. Patent No. 7,956,526 ("Hasnain") (HEATH002469–81);
- U.S. Patent No. 8,598,805 ("Tremblay") (HEATH000568–629);
- U.S. Publication No. 2004/0066142 ("Stimac") (HEATH002459–68);
- U.S. Publication No. 2006/0022916 ("Aiello");
- U.S. Publication No. 2007/0182338 ("Shteynberg '338") (HEATH013842–64);
- U.S. Publication No. 2007/0182347 ("Shteynberg '347") (HEATH013865–83);
- U.S. Publication No. 2008/0258647 ("Scianna") (HEATH013884–94);
- U.S. Publication No. 2009/0160369 ("Godbole") (HEATH013895–907);
- Lights of America prior art device (Model No. 9600LEDBRZSC) with non-dimmable LED bulb (2025LEDE12-30K), December 2008[1] (available for inspection as of September 28, 2015) (HEATH014253–63);
- Light Emitting Design's Lamps, including Conventional Lamp Medium Base, Hi Lumen Dimmable Retrofit and LED PAR Retrofit, September 7, 2008 (HEATH013816–17, HEATH013840);
- Lighting Science Group's high-output, dimmable, Edison-base LED bulb, May 5, 2009 (HEATH013818–19; *see also* HEATH013820–21, HEATH013837–39);
- Osram Sylvania's "LED Retrofit Lamps," 2008 (HEATH013908–4247);
- Megaman Global's DorS technology, July 2006 (HEATH013814–15, HEATH013822–26);

---

[1] The date code on the fixture is "8CK50," indicating that the fixture was produced in the 50th week of 2008 by HeathCo's manufacturer, Checkson. (*See* ECF Nos. 82, 87 (discussing HeathCo date code labels.))

- *Running LEDs from an AC supply*, LEDs Magazine, May 2, 2006 (HEATH014264–80); and
- Taekhyum Kim, Polyspectral Signal Analysis Techniques for Interhamonics in Shipboard Power Systems (Aug. 2008) (Ph.D. dissertation, University of Texas at Austin).

*See* Chart 1, *infra*, which identifies where specifically in the DualBrite Prior Art each element of the Asserted Claim is found. It would have been obvious to one of ordinary skill in the art as of at least the filing date of the application that led to the '163 patent to combine the teachings of the DualBrite Prior Art with the knowledge of one skilled in the art and/or the cited prior art to achieve the Asserted Claim because they all teach similar matters in the narrow field of lighting systems and involve substituting only a limited number of elements for other elements with a predictable result. (*See, e.g.*, HEATH013814–15: "Efficient LEDs are transforming the world;" "Dimming controls are increasingly being used in residential and commercial settings;" and "controllable LEDs, which can increase and decrease in luminance . . . decorative lighting for the outside of buildings has become one of the biggest new markets in lighting"; HEATH013818–19: introducing "LED replacement for standard incandescent lamps" including a "new dimmable, energy-smart and long life LED lamp that fits into existing standard sockets.")

U.S. Patent No. 7,190,125 to McDonough (HEATH000552–67) renders the Asserted Claim of the '163 patent obvious by itself in light of the knowledge of a person skilled in the art and/or in light of the prior art, including, but not limited to:

- U.S. Patent No. 7,086,756 ("Maxik") (HEATH002499–511);
- U.S. Patent No. 7,296,913 ("Catalano") (HEATH002482–98);
- U.S. Patent No. 7,344,275 ("Allen") (HEATH014438–68);
- U.S. Patent No. 7,450,095 ("Yu") (HEATH014469–74);
- U.S. Patent No. 7,564,198 ("Yamamoto") (HEATH014475–91);
- U.S. Patent No. 7,956,526 ("Hasnain") (HEATH002469–81);
- U.S. Patent No. 8,598,805 ("Tremblay") (HEATH000568–629);
- U.S. Publication No. 2004/0066142 ("Stimac") (HEATH002459–68);
- U.S. Publication No. 2006/0022916 ("Aiello");
- U.S. Publication No. 2007/0182338 ("Shteynberg '338") (HEATH013842–64);

4

- U.S. Publication No. 2007/0182347 ("Shteynberg '347") (HEATH013865–83);
- U.S. Publication No. 2008/0258647 ("Scianna") (HEATH013884–94);
- U.S. Publication No. 2009/0160369 ("Godbole") (HEATH013895–907);
- Lights of America prior art device (Model No. 9600LEDBRZSC) with non-dimmable LED bulb (2025LEDE12-30K), December 2008 (available for inspection as of September 28, 2015) (HEATH014253–63);
- Light Emitting Design's Lamps, including Conventional Lamp Medium Base, Hi Lumen Dimmable Retrofit and LED PAR Retrofit, September 7, 2008 (HEATH013816–17, HEATH013840);
- Lighting Science Group's high-output, dimmable, Edison-base LED bulb, May 5, 2009 (HEATH013818–19; *see also* HEATH013820–21, HEATH013837–39);
- Osram Sylvania's "LED Retrofit Lamps," 2008 (HEATH013908–4247);
- Megaman Global's DorS technology, July 2006 (HEATH013814–15, HEATH013822–26);
- *Running LEDs from an AC supply*, LEDs Magazine, May 2, 2006 (HEATH014264–80); and
- Taekhyum Kim, Polyspectral Signal Analysis Techniques for Interhamonics in Shipboard Power Systems (Aug. 2008) (Ph.D. dissertation, University of Texas at Austin).

*See* Chart 2, *infra*, which identifies where specifically in McDonough each element of the Asserted Claim is found. It would have been obvious to one of ordinary skill in the art as of at least the filing date of the application that led to the '163 patent to combine the teachings of McDonough with the knowledge of one skilled in the art and/or the DualBrite Prior Art and the cited prior art to achieve the Asserted Claim because they all teach similar matters in the narrow field of lighting systems and involve substituting only a limited number of elements for other elements with a predictable result. (*See, e.g.*, HEATH013814–15: "Efficient LEDs are transforming the world;" "Dimming controls are increasingly being used in residential and commercial settings;" and "controllable LEDs, which can increase and decrease in luminance . . . decorative lighting for the outside of buildings has become one of the biggest new markets in lighting"; HEATH013818–19: introducing "LED replacement for standard incandescent lamps" including a "new dimmable, energy-smart and long life LED lamp that fits into existing standard sockets.")

5

The '163 patent is invalid under § 102(f) for improper inventorship and/or failure to name all inventors of the subject matter claimed in the '163 patent, including at least Wilson Chen of Luminex. "Conception is the touchstone of inventorship." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F. 3d 1223, 1227–28 (Fed. Cir. 1994). Joint invention occurs where multiple co-inventors contributed to the invention. "All that is required of a joint inventor is that he or she (1) contribute in some significant manner to conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998). "[F]or the conception of a joint invention, each of the joint inventors need not make the same type or amount of contribution to the invention," but rather, "each needs to perform only a part of the task which produces the invention." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). "One who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." *Nartron Corp. v. Schukra U.S.A., Inc.*, 558 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *Garrett Corp. v. United States*, 422 F.2d 874, 881 (Ct. Cl. 1970)). Wilson Chen contributed in a significant manner to the conception and reduction to practice of the alleged invention claimed in the '163 patent. Mr. C.T. Chen merely suggested the idea of a result to be accomplished, and tasked Wilson Chen with determining the means of accomplishing the idea. Thus, Mr. C.T. Chen is not a properly named inventor, or at a minimum, Mr. Wilson Chen should also be listed as a joint inventor of the subject matter claimed in the '163 patent.

The Asserted Claim of the '163 patent is also invalid as not enabled and not supported by an adequate written description under 35 U.S.C. § 112(1).

(1) The Asserted Claim requires an input of $V_t$ (the threshold voltage for the electric current flowing in the lighting load), frequency of the AC power and $V_m$ (the voltage amplitude of the AC power) in order to calculate the time difference range. However, the specification of the '163 patent does not disclose how the claimed device measures and inputs these parameters in application. Accordingly, the '163 patent does not disclose how the claimed invention, i.e., the claimed apparatus, inputs these claimed parameters and calculates the claimed time range. As of the filing date of the application that led to the '163 patent, a person of skill in the art could not determine from the specification how to make and use the invention without undue experimentation and would not recognize the specification as demonstrating the inventor's possession of the invention.

(2) The Asserted Claim also requires that the claimed microcontroller "sends out a zero-crossing point time delay pulse," "receives the symmetric square-wave and sends out a zero-crossing-point time-delay pulse to the semi-conductor switching device" and that the "time-delay pulse lags with a time difference behind the edge of the symmetric square-wave, wherein the said time difference ranges from $(t_o)$ to $1/(2f)-t_o)$ . . . ." However, the specification does not disclose how the microcontroller is programmed to accomplish any of these steps. The specification generally states that the microcontroller "modif[ies] the time-delay pulse subroutine for generating the zero-crossing point time-delay pulses with an appropriate $t_D$" but nowhere discloses how this modification of the program for such subroutine is accomplished, such as by disclosure of an algorithm or the like. Similarly, the specification states the "[t]he microcontroller 42 in accordance with the present invention may be flexibly and

accurately designed to have pulses of different types with variant time lag $t_D$" but does not disclose how the programming of the microcontroller is designed to accomplish this. The named inventor, Mr. C.T. Chen, confirmed that he is not a programmer, that the programmer's job is to design and write the program, and that a programmer would have to write software code for the microcontroller to define the various time delay signals to represent different functions required by the customer. (*See, e.g.*, C.T. Chen Dep. Tr. 130:1–20, 134:2–6.) The '163 patent specification nowhere discloses or describes this code. As of the filing date of the application that led to the '163 patent, a person of skill in the art could not determine from the specification how to make and use the apparatus of the claimed invention without undue experimentation and would not recognize the specification as demonstrating the inventor's possession of the claimed invention.

The '163 patent in its entirety, including the Asserted Claim, is unenforceable due to inequitable conduct during prosecution of the application that led to the '163 patent. The named inventor, Mr. C.T. Chen, was aware of prior art devices, including a Heath/Zenith device having the accused circuitry, but did not cite such prior art devices to the USPTO at any time during prosecution. Mr. C.T. Chen admitted at his deposition that (1) he was aware that Heath sold two-level lighting fixtures before he filed the application that led to the '163 patent (C.T. Chen Dep. Tr. 69:18–21); (2) he had his employees test a Heath two-level fixture in or around 2005 (*id.* at 70:8–10); and (3) he had a factory employee and/or his own employee, Wilson Chen, break open the fixture (*id.* at 72:2–73:23, 80:15–81:15). Despite this, Mr. C.T. Chen did not cite the prior art device or testing to the USPTO. Mr. Chen also was aware of prior art patent references that he did not cite to the USPTO at any time during prosecution. These prior art patent references

8

include at least U.S. Patent Nos. 7,804,252 and 5,747,937. The prior art Heath/Zenith device and testing and the U.S. patents were each material references; withholding each of these references was an intentional act done by Mr. C.T. Chen with the deliberate intent to deceive the USPTO.

These Final Invalidity And Unenforceability Contentions are based upon the information presently known to Defendants. Defendants' investigation is on-going and the Court has not yet ruled on any construction of the Asserted Claim. Defendants reserve the right to alter or amend their invalidity contentions in light of further discovery, claim construction positions, court rulings and expert opinion.

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| 1. A lighting control system using with a microcontroller, comprising: | The Heath/Zenith Secure Home DualBrite® Motion Sensing Diecast Lantern, Model No. 4192 ("DualBrite Prior Art"), is a lighting system. (HEATH000697; *see also* HEATH000145; HEATH000195; HEATH000202; HEATH000314; HEATH000315; HEATH000389; HEATH013770.) Model No. 4192 and these documents are representative of numerous models of the DualBrite lights sold more than one year prior to the filing date of the application that matured into the '163 patent; other product specifications and circuit diagrams for other similar versions of the DualBrite lights have been produced by Defendants and are equally applicable.<br><br>Model No. 4192 uses a customized ASIC rather than a microcontroller. (*See* Defs.' Initial Non-Inf. Conts.) However, if this element is construed either literally or under the doctrine of equivalents to cover the accused devices, including Model No. 4192, then the DualBrite Prior Art also contains this element. The construction and operation of the DualBrite Prior Art, which is now sold as Model No. 4192 (as one model), has not changed in any way relevant to the claims. Thus, if Model No. 4192 meets this claim limitation, so too does the DualBrite Prior Art. (*See, e.g.*, HEATH000145 at "PIR2003_22PIN IC1.") |
| a lighting load; | Model No. 4192 is not sold with a light bulb. (*See* Defs.' Initial Non-Inf. Conts.) However, if this element is construed either literally or under the doctrine of equivalents to cover the accused devices, including Model No. 4192, then the DualBrite Prior Art also contains this element. The construction and operation of the DualBrite Prior Art, which is now sold as Model No. 4192 (as one model), has not changed in any way relevant to the claims. Thus, if Model No. 4192 meets this claim limitation, so too does the DualBrite Prior Art. (*See, e.g.*, HEATH000697, 703 (showing bulb holders and circuitry for insertion of light bulbs up to 360 Watt maximum.)) |

10

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | Alternatively, if this element is not anticipated by the DualBrite Prior Art, then the DualBrite Prior Art renders it obvious. The use of a lighting load would have been an obvious, well-known and predictable design parameter to a person of ordinary skill in the art as of the filing date of the application that led to the '163 patent. By its very nature, the DualBrite Prior Art required a lighting load, i.e., a light bulb, to be inserted into the fixture in order for it to work for its intended purpose. Additionally, for example, the DualBrite Prior Art was sold with a user manual that states that a light bulb is needed for installation. (*See, e.g.*, HEATH000698.) Thus, even if Plaintiff's Infringement Contentions alone do not satisfy Defendants' burden to show that the lighting load element is met under *Vanmoor*, this element is obvious based upon the DualBrite Prior Art Devices. *See, e.g.*, *Dippin' Dots, Inc. v. Mosey*, 476 F. 3d 1337, 1343 (Fed. Cir. 2007). |
| a semi-conductor switching device coupled to the lighting load and an AC power, wherein the semi-conductor switching device controls a time period for the AC power transmitting an electric power to the lighting load; | The DualBrite Prior Art contains a semi-conductor switching device, i.e., a TRIAC, coupled to the lighting load and an AC power, wherein the semi-conductor switching device controls a time period for the AC power transmitting an electric power to the lighting load. The construction and operation of the DualBrite Prior Art, which is now sold as Model No. 4192 (as one model), has not changed in any way relevant to the claims. Thus, if Model No. 4192 meets this claim limitation, so too does the DualBrite Prior Art. (*See, e.g.*, HEATH000145 at "Q2.") |
| a zero-crossing-point detection circuit coupled to the AC power, wherein the zero-crossing-point detection circuit converts AC voltage sine-waves into symmetric square-waves, and an edge of the symmetric square-wave corresponds to a zero-crossing point of the AC voltage sine-wave; | Model No. 4192 does not comprise "a zero-crossing-point detection circuit coupled to the AC power, wherein the zero-crossing-point detection circuit converts AC voltage sine-waves into symmetric square-waves." (*See* Defs.' Initial Non-Inf. Conts.) However, if this element is construed either literally or under the doctrine of equivalents to cover the accused devices, including Model No. 4192, then the DualBrite Prior Art also contains this element. The construction and operation of the DualBrite Prior Art, which is now sold as Model No. 4192 (as one model), has not changed in any way relevant to the |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
| --- | --- |
| **CLAIM LIMITATION** | **DEFENDANTS' INVALIDITY POSITION** |
|  | claims. Thus, if Model No. 4192 meets this claim limitation, so too does the DualBrite Prior Art. (*See, e.g.*, HEATH000145.)<br><br>Alternatively, if this element is not anticipated by the DualBrite Prior Art, then the DualBrite Prior Art renders it obvious. The DualBrite Prior Art contains a zero-crossing-point detection circuit, but uses a customized ASIC that uses the sine wave supplied from the AC line voltage to create a square wave. It would be obvious from the DualBrite Prior Art to a person of ordinary skill in the art to use a zero-crossing-point detection circuit that converts AC voltage sine-waves into symmetric square-waves. (*See, e.g.*, HEATH000145.) Thus, even if Plaintiff's Infringement Contentions alone do not satisfy Defendants' burden to show that the lighting load element is met under *Vanmoor*, this element is obvious based upon the DualBrite Prior Art Devices. *See also, e.g.*, *Dippin' Dots, Inc. v. Mosey*, 476 F. 3d at 1343. |
| and a microcontroller coupled to the semi-conductor switching device and the zero-crossing-point detection circuit, wherein the microcontroller receives the symmetric square-wave and sends out a zero-crossing-point time-delay pulse to the semi-conductor switching device, | Model No. 4192 uses a customized ASIC rather than a microcontroller. (*See* Defs.' Initial Non-Inf. Conts.) However, if this element is construed either literally or under the doctrine of equivalents to cover the accused devices, including Model No. 4192, then the DualBrite Prior Art also contains this element. The construction and operation of the DualBrite Prior Art, which is now sold as Model No. 4192 (as one model), has not changed in any way relevant to the claims. Thus, if Model No. 4192 meets this claim limitation, so too does the DualBrite Prior Art. (*See, e.g.*, HEATH000145 at "PIR2003_22PIN IC1" and "Q2.") |
| and the zero-crossing-point time-delay pulse lags with a time difference behind the edge of the symmetric square-wave, wherein the said time difference ranges from ($t_o$) to ($1/(2f)-t_o$), wherein $t_o$ $=(1/2\pi f)\sin^{-1}(V_t/V_m)$, f is frequency of the AC power, $V_m$ is voltage amplitude of the AC power and $V_t$ is threshold voltage for the electric current | Model No. 4192 does not comprise a time difference that ranges from ($t_o$) to ($1/(2f)-t_o$), wherein $t_o=(1/2\pi f)\sin^{-1}(V_t/V_m)$, f is frequency of the AC power, $V_m$ is voltage amplitude of the AC power and $V_t$ is threshold voltage for the electric current flowing in the lighting load. (*See* Defs.' Initial Non-Inf. Conts.) However, if this element is construed either literally or under the doctrine of equivalents to cover the accused devices, including Model No. 4192, then the DualBrite Prior Art also contains this element. The construction and operation |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| flowing in the lighting load. | of the DualBrite Prior Art, which is now sold as Model No. 4192 (as one model), has not changed in any way relevant to the claims. Thus, if Model No. 4192 meets this claim limitation, so too does the DualBrite Prior Art. |
| | |
| 7. The system of claim 1, wherein the lighting load includes a DC light-emitting diode module bridging one port of a full-wave bridge rectifier. | *See supra* regarding claim 1.<br><br>The DualBrite Prior Art was inherently capable of functioning with a "lighting load [that] includes a DC light-emitting diode module bridging one port of a full-wave bridge rectifier." Plaintiff has accused Model No. 4192 of infringing this claim when an LED bulb is inserted into the fixture. Thus, if this element is construed either literally or under the doctrine of equivalents to cover the accused devices, including Model No. 4192, then the DualBrite Prior Art also inherently contains this element, since bulbs that included a DC light-emitting diode module bridging one port of a full-wave bridge rectifier were known as of the filing date of the application that led to the '163 patent, as described further below.<br><br>Even if this claim element is not anticipated by the DualBrite Prior Art, then the DualBrite Prior Art renders it obvious on a variety of bases.<br><br>First, the DualBrite Prior Art renders this claim element obvious by itself in light of the knowledge of a person skilled in the art. LEDs were generally known prior to filing the application that led to the '163 patent. (*See, e.g.*, C.T. Chen Dep. Tr. 65:24–66:2 ("LED has been in the market since the invention in the lab for nearly 50 years"); HEATH002505 at 1:31–32 ("Light emitting diodes are well-known and have been used for many years.")) A person of ordinary skill in the art would recognize that a bulb that includes a DC light-emitting diode module bridging one port of a full-wave bridge rectifier could be used in the DualBrite Prior Art Device as of filing date of the application that led to the '163 patent, since such LED bulbs were known as of that date. |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | Notably, nothing in claim 7 (or claim 1) requires that the bulb be dimmable. Regardless, both dimmable and non-dimmable LED bulbs were available, i.e., on sale, in public use, or described in publications, prior to the filing date of the application that led to the '163 patent (as discussed below).<br><br>*Exemplary Non-Dimmable LED Bulbs*<br><br>Defendants have obtained and made available for inspection on September 28, 2015 a Lights of America prior art device (Model No. 9600LEDBRZSC) that included a non-dimmable LED bulb (2025LEDE12-30K). The 2025LEDE12-30K bulb contains a series connection of 20 LEDs. (HEATH014253–63.) The LEDs are connected using a full wave bridge rectifier, with the addition of resistors to limit the current and a capacitor to reduce the flicker of the bulb. (*See id.*) These bulbs were on sale and/or in public use by at least December 2008. As another example, in its 2008 product catalog, Osram Sylvania offered for sale several non-dimmable "LED Retrofit Lamps." (HEATH014235.)<br><br>*Exemplary Dimmable LED Bulbs*<br><br>Megaman Global introduced "Dimming on Random Switches" (DorS) technology for their light saving LED bulbs by at least July 2006. (*See, e.g.*, HEATH013814–15; HEATH013822–26.)<br><br>Lighting Science Group offered for sale a bulb around May 5, 2009 (before the filing date of the application that led to the '163 patent) that it described as an LED "designed to replace the standard incandescent and compact fluorescent lamps (CFLs) in homes and commercial environments" and that was "available in the most popular standard |

14

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | incandescent lamp or bulb shape – A19." (*See, e.g.*, HEATH013818–19; *see also* HEATH013820–21 ("LSG is the first company to market with a high-output, dimmable, Edison-base LED bulb"); HEATH013837–39 (describing, illustrating and offering for sale LSG's "new Light Emitting Diode (LED) low wattage replacement lamp for the standard incandescent lamp.")) <br><br> By at least September 7, 2008, Light Emitting Diode Designs, LLC, began offering for sale both dimmable and non-dimmable LED bulbs. (HEATH013816–17 (catalog) and HEATH013840 (noting 090708 revision date of its latest product catalog.)) <br><br> As defined in claim 1, $V_t$ is the threshold voltage for the electric current flowing in the lighting load. As of the filing date of the application that led to the '163 patent, it was well-known that LED bulbs have threshold voltages. For example, U.S. Patent No. 7,450,095 states: <br><br> Because the application of LED is universal, various kinds of drive circuits and drive chips come into being. FIG. 1 is a voltage versus current characteristic curve of an ordinary diode. Except for some specific usages, a diode generally operates under forward bias. The relationship between the voltage and current of diode is expressed with an exponential curve. When the voltage across two terminals of a diode exceeds a certain voltage $V_f$ (which is usually termed as the cut-in voltage or the threshold voltage, and is about 0.5-0.8V, depending on the diode material and doping concentration), the current of the diode increases abruptly. Before this cut-in voltage, the current in the diode is very small. The characteristics of an LED is the same as those of a diode. As its name implies, an LED will emit light when it is forward biased. |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | (HEATH014473 at 1:37–50.) (*See also* U.S. Publication No. 2006/0022916 at Abstract, ¶ [0022] ("a LED can be considered as a normal diode, with the sole difference that it has a higher threshold voltage $V_f$ (normally around 3 V as against the 0.7 V of a normal diode).")) <br><br> The 2006 DualBrite Prior Art Device (Model No. 4192) operated with a time difference of 1.6 mS when turned on to full brightness (i.e., DualBrite functionality turned on, and motion detected). (*See, e.g.*, ECF Nos. 80, 85.) <br><br> Solving for $V_t$ in the equation recited in claim 1 gives: <br><br> $$V(t) = V_m \sin \omega t$$ <br><br> where $\omega = 2\pi f$. Using a frequency of the AC power of 60 Hz, a $V_m$ of 110, and t of 1.6 mS, $V_t$ is calculated to be about 62.4V. One skilled in the art at the time of the filing date of the application that matured into the '163 patent would know that a typical LED bulb, including the non-dimmable and dimmable bulbs described above, would have a lower threshold voltage than 62.4V, such that a typical LED bulb would illuminate when used in the DualBrite Prior Art Device. Thus, the DualBrite Prior Art renders this claim element obvious by itself in light of the knowledge of a person skilled in the art <br><br> Second, the DualBrite Prior Art also renders this claim element obvious in light of the prior art, as discussed below. <br><br> As of filing date of the application that led to the '163 patent, it was known that LEDs only permit one-way conduction of current (*see, e.g.*, C.T. Chen Dep. Tr. at 66:4–5, 102:24–6) but that circuitry or other solutions, such as bridge rectifiers, could be used to permit use of alternating current with such diodes. |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
| --- | --- |
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | For example, U.S. Publication No. 2004/0066142 ("Stimac") describes:<br><br>[E]ach electronics module 14, 60, 70 also contains suitable electronic components 80 for converting the input electrical supply power 82 . . . to conditioned output electrical power delivered to the output coupler 52 and adapted for driving the optics module 72. The received input power 82 is conditioned in a step 84. **The conditioning 84 in the case of an a.c. input preferably includes rectification, since LEDs are advantageously driven by a d.c. current.** In one suitable embodiment, a switching power supply of a type known to the art is used for the power conditioning and rectification 84 of an a.c. input power 82, along with optional EMI/RFI filtering. **Of course, the detailed electronics for performing the conditioning 84 depends upon the type of the input power supply and the power output desired for the optics module 12. Those skilled in the art can readily select appropriate electronics and component values therefor to perform the power conditioning step 84.**<br><br>(HEATH002466 ¶ [0038] (emphasis added.))[2]<br><br>As another example, an article published in LEDs magazine in 2006 describes that:<br><br>To run an LED-based fixture from a mains supply (e.g. 120 V AC) requires electronics between the supply and the devices themselves to provide a DC voltage (e.g. 12 V DC) capable of driving several LEDs. . . . **There are several options for operating LEDs from an AC** |

---

[2] Stimac also describes using: an Edison-type threaded connector (*id.* ¶ [0035]), a DMX-512 microcontroller or application-specific integrated circuit (ASIC) (*id.* ¶ [0039]) and dimming (*id.* ¶ [0041]).

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | **power supply**. Many stand-alone LED fixtures simply have a transformer between the wall socket and the fixture to provide the required DC voltage. **A number of companies have developed LED light bulbs that screw directly into standard sockets, but these invariably also contain miniaturized circuitry that converts AC to DC before delivering it to the LEDs. Another approach is to configure the LEDs or die themselves into a DC bridge circuit.** Although AC is input to this LED bridge circuit configuration, the LEDs are still driven with DC and this approach requires more drive power than a "true" AC-LED design. <br><br> (HEATH014267–68 (emphasis added.)) <br><br> U.S. Patent No. 7,564,198 ("Yamamoto") discloses Figure 8, below: <br><br>  <br> FIG.8 <br> PRIOR ART <br><br> Yamamoto explains: |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | FIG. 8 is a schematic view showing one embodiment of an LED lighting device according to prior art. In the figure, there are provided a commercial AC source 400; a full-wave rectifier circuit 401 comprised of rectifier diodes $401_1$ to $401_4$ for rectifying the commercial AC source; a current-limiting resistor 402 connected to a plus output terminal A of the full-wave rectifier circuit 401 for limiting a current flowing through an LED array 403 . . .; a capacitor 404 for smoothing an output of the full-wave rectifier circuit . . . .<br><br>(HEATH014485 at 1:19–34.)<br><br>U.S. Patent No. 7,296,913 ("Catalano") similarly recognizes that one skilled in the art would be familiar with the concept of using a rectifier to convert an AC power source to DC:<br><br>Electrical power is provided to the light emitting elements 108 via electrical connectors 112 which connect to each light emitting element 108 and to the base 104. . . . Electrically supplied to these electrical connectors 112 can be AC or DC, in the case of AC the necessary control circuitry 115 may be located for converting the AC power to DC power is used. This control circuitry 115 may include resistors, rectifying diodes, and Zener diodes. Rectifying diodes convert AC to DC, should the power source to the LED's be AC. Rectifying diodes are not needed when the power supply is DC.<br><br>(HEATH002506–07 at 4:52–5:11.)<br><br>U.S. Patent No. 7,344,275 ("Allen") also discloses full-wave bridge rectifiers: |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | Fig. 4<br><br><br><br>Allen explains: "FIG. 4 shows an example schematic electrical diagram for the AC-to-DC converter employed in both diagrams of FIG. 3. The AC input to the circuit in FIG. 1 is indicated by the symbol for an AC source 401. . . . The actual AC to DC rectification is performed by use of a full-wave bridge rectifier 403. This bridge rectifier 403 results in a rippled DC current and therefore serves as an example circuit only. . . . FIG. 4A shows an alternate example schematic electrical diagram for the AC-to-DC converter employed in both diagrams of FIG. 3 wherein full wave rectification is split, eliminating one wire." (HEATH014462 at 12:11–29.) Allen continues: "A full-wave rectifier may also be used to obtain higher duty factor for the diodes which, without the rectifier, would turn on and off during each AC cycle at an invisibly high rate (e.g., 50 or 60 Hz). The LEDs themselves may be a mixture of any type, including any size, shape, material, color or lens, and the LEDs may have different resistance values. In the preferred (but not necessary) embodiment, the diode network is directly driven from the AC power source, without any form of current-limiting circuitry external to the diode. Specifically, the invention is intended to encompass an arrangement whereby the resistance values of individual LEDs is altered such as with a drop-down resistor disposed in one or more of the LEDs." (HEATH014463 at 14:31–44.) |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
| --- | --- |
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | (*See also, e.g.*, U.S. Publication No. 2007/0182338; U.S. Publication No. 2007/0182347; U.S. Publication No. 2008/0258649; and U.S. publication No. 2009/0160369; Kim dissertation at 93 ("A diode bridge rectifier provides full wave rectification of AC voltage to sequential components. Both compact fluorescent and LED lamps require the rectified voltage to produce light output, while incandescent lamps directly generate light output from AC power."))<br><br>Thus, as of the filing date of the application that led to the '163 patent, one skilled in the art would know that a lighting system, such as the DualBrite Prior Art, may accept various types of light bulbs and that a full-wave bridge rectifier could be used in an LED to convert AC to DC power. One skilled in the art would be motivated to combine his/her knowledge that such an LED bulb was available and would be compatible with the DualBrite Prior Art to arrive at this claimed limitation.<br><br>As described above, both dimmable and non-dimmable LED bulbs were known. Further, the desirability of using such bulbs to replace incandescent bulbs was well-known prior to the filing date of the application that led to the '163 patent. For example, U.S. Patent No. 7,296,913 to Catalano describes that "Currently lighting applications are dominated by incandescent lighting products" but that "[l]ight emitting diodes have operating advantages compared to ordinary incandescent as well as halogen lights." (HEATH002492 at 1:21–22, 1:39–40.) Stimac (HEATH002459–68) explains that many commercial mirrored reflector/parabolic aluminized reflector (MR/PAR) lamps existed that were compatible with a wide range of electrical input standards, including 110 V as well as lower voltages such as 6 V or 12 V. (¶ 3.) Stimac continues:<br><br>Those skilled in the art will recognize that the described modular lamp 10 overcomes significant problems which LED lamp |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | manufacturers have previously struggled with. For example, the lamp . . . is suitable for replacing a conventional MR- or PAR-type lamp in a lamp fixture that includes one of a plurality of types of electrical receptacles. The electronic connector module . . . is selected and joined to the optics module 12, either at the factory or by the end user, to form an LED based retro-fit lamp which is installed into the electrical receptacle of the lamp fixture in the usual manner, for example by screwing in the LED-based lamp when using an Edison-type threaded connector.<br><br>(*Id.* ¶ 45.)<br><br>As discussed above, $V_t$ for LED bulbs was well-known.<br><br>Thus, long before Plaintiff filed its patent application, those skilled in the art were familiar with (1) LED bulbs (both dimmable and non-dimmable); (2) the advantages LED bulbs offered over incandescent and other bulbs; (3) that an LED bulb had a threshold voltage $V_t$ that must be met in order to turn on, necessitating the use of a time delay to ensure the LED bulb receives sufficient current voltage to turn on; and (4) known solutions for using LED bulbs in lighting fixtures that typically accepted incandescent and other types of then-more-common bulbs.<br><br>It would have been obvious to one of ordinary skill in the art as of the filing date of the application that led to the '163 patent to combine the teachings of the DualBrite Prior Art Devices with his/her knowledge and/or the above prior art teachings because they all teach similar matters in the narrow field of lighting systems and involve substituting only a limited number of elements for other elements with a predictable result. |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
| --- | --- |
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | Indeed, such a predictable result is shown by inserting such known LED bulbs into the DualBrite Prior Art Device (Model No. 4192) manufactured in 2006 that Defendants obtained and made available for inspection. (ECF Nos. 76–90.) When either a dimmable or non-dimmable LED bulb is inserted into that DualBrite Prior Art Device, the device turns on, i.e., the LED bulb illuminates. (*Id.*) For instance, the LED bulb inserted into the 2006 DualBrite Prior Art Device in conjunction with testing for Defendants' Summary Judgment Motion was an outdoor wet-rated dimmable LED light bulb (Cree Soft white 4 flow bulb (BA19-08027OMF-12DE26-3M100)) that was purchased in 2015. (ECF Nos. 80, 85.) This Cree bulb contains a full-wave bridge rectifier. (HEATH014248–51.) The DualBrite Prior Art Device turned on when used with this bulb. Similarly, when the non-dimmable LED bulb (2025LEDE12-30K) from 2008 was inserted into the DualBrite Prior Art Device, it turned on. The 2025LEDE12-30K bulb also contains a full-wave bridge rectifier. (HEATH014253–63.) The numerous references showing the well-known use of LED bulbs to replace a more traditional incandescent bulb in lighting fixtures, and in particular, the use of LED bulbs in a lighting fixture (the Lights of America prior art device) that used the same circuitry as that found in the accused devices (i.e., the PIR2003 chip used in Model No. 4192), highlights the obviousness of combining the above related references to render obvious claim 7 of the '163 patent. Plaintiff has previously suggested that the DualBrite Prior Art Devices had to be labeled as LED compatible, or that Defendants had to have recommended the devices for use with LEDs in order to invalidate this claim. This allegation is without merit. The DualBrite Prior Art Devices were capable of functioning with a lighting load that includes a DC light-emitting diode module bridging one port of a full-wave bridge rectifier, as described above. No engineering |

| CHART 1: HEATHCO'S PRIOR SALES OF MODEL NO. 4192 AND SIMILAR MODELS | |
|---|---|
| **CLAIM LIMITATION** | **DEFENDANTS' INVALIDITY POSITION** |
| | changes were made to any component of the DualBrite Prior Art Device (Model No. 4192) to enable the LED bulbs from 2008 or 2015 to work. Moreover, there did not have to be a label that the device was LED compatible or that LEDs were recommended for use with the device. As described above, LED bulbs were known before the filing date of the application that led to the '163 patent and the DualBrite Prior Art Devices were capable of functioning with LEDs prior to that date. The use of such bulbs would have been an obvious, well-known and predictable design parameter to a person of ordinary skill in the art at that time. |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| 1. A lighting control system using with a microcontroller, comprising: | McDonough (HEATH000552–67) discloses a lighting control system using a microcontroller. McDonough states "the invention relates to lighting control devices. More particularly, the invention relates to programmable wallbox dimmers." (HEATH000560 at 1:5–7.) McDonough discloses "The lighting control device may include . . . a microcontroller . . . ." (HEATH000561 at 4:53–56.) McDonough describes that the microcontroller may execute computer-executable instructions that are stored on a computer-readable medium, such as random-access or read-only memory within the wallbox dimmer. (HEATH000564 at 10:37–45.) |
| a lighting load; | McDonough discloses a lighting load. McDonough states "The invention provides a programmable lighting control device that controls a light intensity level of at least one lamp." (*Id.* at 4:51–53; *see also* Fig. 3, reference 116.) |
| a semi-conductor switching device coupled to the lighting load and an AC power, wherein the semi-conductor switching device controls a time period for the AC power transmitting an electric power to the lighting load; | McDonough discloses a semi-conductor switching device coupled to the lighting load and an AC power, wherein the semi-conductor switching device controls a time period for the AC power transmitting an electric power to the lighting load. McDonough states that "The lighting load 116 may be connected through a controllably conductive device 118. Controllably conductive device 118 has a control, or gate, input 126, which is connected to a gate drive circuit 131. It should be understood that control inputs on the gate input 126 will render the controllably conductive device 118 conductive or non-conductive, which in turn controls the power supplied to the lighting load 116. Drive circuitry 131 provides control inputs to the controllably conductive device 118 in response to command signals from a microcontroller 132." (HEATH000562 at 6:4–14; *see also* Fig. 3.) McDonough continues that "Phase-controlled dimmers are well known and perform dimming functions by selectively connecting the AC power source 148 to the lighting load 116 during each half-cycle of the AC waveform received from the power source. The AC power may be switched using controllably conductive devices [118] such as triacs, anti-parallel SCRs, field effect transistors (FETs), or insulated gate bipolar |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | transistors (IGBTs). The amount of dimming is determined by the ratio of 'ON' time to 'OFF' time of the controllably conductive device 118." (*Id.* at 6:14–23.) |
| a zero-crossing-point detection circuit coupled to the AC power, wherein the zero-crossing-point detection circuit converts AC voltage sine-waves into symmetric square-waves, and an edge of the symmetric square-wave corresponds to a zero-crossing point of the AC voltage sine-wave; | McDonough discloses a zero-crossing-point detection circuit coupled to the AC power, wherein the zero-crossing-point detection circuit converts AC voltage sine-waves into symmetric square-waves, and an edge of the symmetric square-wave corresponds to a zero-crossing point of the AC voltage sine-wave. McDonough states that "The zero-crossing detector determines the zero-crossing points of the input waveform from the power supply 112. The microcontroller sets up gate control signals to operate the switching device to provide voltage from the power supply 112 to the load 116 at predetermined times relative to the zero-crossing points of the waveform. The zero-crossing detector may be a conventional zero-crossing detector, and need not be described here in further detail." (HEATH000560 at 2:24–32.) McDonough further states "zero-crossing detector 134 determines the zero-crossing points of the input 60 HZ AC waveform from the AC power source 148." (HEATH000562 at 6:53–55; *see also* Fig. 3.) A conventional zero-crossing detector is typically understood to convert sine waves into square waves when the sine wave crosses zero. (*See, e.g.*, U.S. Patent No. 4,345,169 at 1:7–15; Figs. 3A, 3B (issued Aug. 17, 1982) (HEATH000548–551.)) |
| and a microcontroller coupled to the semi-conductor switching device and the zero-crossing-point detection circuit, wherein the microcontroller receives the symmetric square-wave and sends out a zero-crossing-point time-delay pulse to the semi-conductor switching device, | McDonough discloses a microcontroller coupled to the semi-conductor switching device and the zero-crossing-point detection circuit, wherein the microcontroller receives the symmetric square-wave and sends out a zero-crossing-point time-delay pulse to the semi-conductor switching device. McDonough states that "Drive circuitry 131 provides control inputs to the controllably conductive device 118 in response to command signals from a microcontroller 132." (HEATH000562 at 6:11–13; *see also* Fig. 3.) McDonough discloses that "Zero-crossing detector 134 determines the zero-crossing points of the input 60 HZ AC waveform from the AC power source 148. The zero-crossing information is provided as an input to microcontroller 132. Microcontroller 132 sets up gate control signals to operate controllably |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| **CLAIM LIMITATION** | **DEFENDANTS' INVALIDITY POSITION** |
| | conductive device 118 to provide voltage from the AC power source to lighting load 116 at predetermined times relative to the Zero-crossing points of the AC waveform. Zero-crossing detector may be a conventional zero-crossing detector, and need not be described here in further detail. In addition, the timing of transition firing pulses relative to the zero crossings of the waveform is also known, and need not be described further." (*Id.* at 6:53–65.) |
| and the zero-crossing-point time-delay pulse lags with a time difference behind the edge of the symmetric square-wave, wherein the said time difference ranges from ($t_o$) to (1/(2f)−$t_o$), wherein $t_o$ =(1/2πf)sin$^{-1}$($V_t$/$V_m$), f is frequency of the AC power, $V_m$ is voltage amplitude of the AC power and $V_t$ is threshold voltage for the electric current flowing in the lighting load. | McDonough discloses that "the zero-crossing-point time-delay pulse lags with a time difference behind the edge of the symmetric square-wave, wherein the said time difference ranges from ($t_o$) to (1/(2f)−$t_o$), wherein $t_o$=(1/2πf)sin$^{-1}$($V_t$/$V_m$), f is frequency of the AC power, $V_m$ is voltage amplitude of the AC power and $V_t$ is threshold voltage for the electric current flowing in the lighting load." As defined in claim 1, $V_t$ is the threshold voltage for the electric current flowing in the lighting load. As of the filing date of the application that led to the '163 patent, it was well-known that LED bulbs have threshold voltages. For example, U.S. Patent No. 7,450,095 states: Because the application of LED is universal, various kinds of drive circuits and drive chips come into being. FIG. 1 is a voltage versus current characteristic curve of an ordinary diode. Except for some specific usages, a diode generally operates under forward bias. The relationship between the voltage and current of diode is expressed with an exponential curve. When the voltage across two terminals of a diode exceeds a certain voltage $V_f$ (which is usually termed as the cut-in voltage or the threshold voltage, and is about 0.5-0.8V, depending on the diode material and doping concentration), the current of the diode increases abruptly. Before this cut-in voltage, the current in the diode is very small. The characteristics of an LED is the same as those of a diode. As its name implies, an LED will emit light when it is forward biased. |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | (HEATH014473 at 1:37–50.) (*See also* U.S. Publication No. 2006/0022916 at Abstract, ¶ [0022] ("a LED can be considered as a normal diode, with the sole difference that it has a higher threshold voltage $V_f$ (normally around 3 V as against the 0.7 V of a normal diode).")) |

A sinusoidal source produces a signal that varies sinusoidally with time. A sinusoid can be expressed as a sine function as follows:

$$V(t) = V_m \sin \omega t$$

where $V_m$ is the maximum amplitude and $\omega$ is the angular frequency, or $\omega = 2\pi f$ (rad/sec). *See, e.g.*, Muhammad H. Rashid, THE ENGINEERING HANDBOOK 109-1–109-2 (Richard C. Dorf ed., CRC Press 2005) (2004), *available at* https://books.google.com/books?id=l_TLBQAAQBAJ&printsec=frontcover#v=onepage&q&f=false.

A time where the voltage reaches $V_t$ is simply:

$$t = \frac{1}{2\pi f} \sin^{-1}\left(\frac{V_t}{V_m}\right)$$

This is the equation for $t_o$, as shown below:

$$V(t) = V_m \sin \omega t$$

Dividing by $V_m$ gives:

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | $$\frac{V_t}{V_m} = \sin \omega t$$ Solving for t: $$\sin^{-1}\left(\frac{V_t}{V_m}\right) = \omega t \quad \text{if} \quad \frac{1}{\omega}\sin^{-1}\left(\frac{V_t}{V_m}\right) = t$$ Substituting ω=2πf gives: $$\frac{1}{2\pi f}\sin^{-1}\left(\frac{V_t}{V_m}\right) = t$$ which is the equation for the claimed $t_o$. Thus, McDonough discloses $t_o$. McDonough also discloses that the time difference ranges from ($t_o$) to $(1/(2f)-t_o)$. McDonough describes "A typical, AC, phase-control dimmer regulates the amount of energy supplied to the lighting load 116 by conducting for some portion of each half-cycle of the AC waveform, and not conducting for the remainder of the half-cycle. Because the dimmer 114 is in series with the lighting load 116, the longer the dimmer 114 conducts, the more energy will be delivered to the lighting load 116. Where the lighting load 116 is a lamp set, the more energy delivered to the lighting load 116, the greater the light intensity level of the lamp set. In a typical dimming scenario, a user may adjust a control to set the light intensity level of the lamp set to a desired light intensity level. The portion of each half-cycle for which the dimmer conducts is based on the selected light intensity level." (HEATH000560 at 1:32–45.) McDonough then describes that a user may program high-end and low-end trim features: "'High end trim' is a feature that governs the maximum intensity level to which the |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| **CLAIM LIMITATION** | **DEFENDANTS' INVALIDITY POSITION** |
| | lighting load 116 may be set by the dimmer. Typical values for the high end trim range between about 60% and about 100% of full intensity. In an example embodiment, the high end trim may be preprogrammed to about be 90% of full intensity. In a wallbox dimmer according to the invention, high end trim is a feature that may be user-programmed as described below. Similarly, 'low end trim' is a feature that governs the minimum intensity level to which the lighting load 116 may be set by the dimmer. Typical values for the low end trim range between about 1% and about 20% of full intensity. In an example embodiment, the low end trim may be preprogrammed to about be 10% of full intensity. In a wallbox dimmer according to the invention, low end trim is a feature that may be user-programmed as described below." (HEATH000564 at 9:10–25.) Thus, McDonough discloses that the user may set the intensity of the light, which in turn sets the time that the dimmer conducts (the longer the dimmer conducts, the more energy it delivers to the lighting load, and vice versa). |
| | |
| 7. The system of claim 1, wherein the lighting load includes a DC light-emitting diode module bridging one port of a full-wave bridge rectifier. | *See supra* regarding claim 1.<br><br>McDonough renders this claim element obvious by itself in light of the knowledge of a person skilled in the art and/or in light of the cited prior art. LED bulbs were generally known prior to the filing date of the application that led to the '163 patent. For example, the DualBrite Prior Art was compatible with LED bulbs. *See supra*; *see also, e.g.*, C.T. Chen Dep. Tr. 65:24–66:2 ("LED has been in the market since the invention in the lab for nearly 50 years."); HEATH002505 at 1:31–32 ("Light emitting diodes are well-known and have been used for many years.") McDonough states that the lighting load "may include a variety of lamps, such as incandescent lamps and/or other lighting loads such as electronic low voltage (ELV) or magnetic low voltage (MLV) loads, for example." (HEATH000560 at 1:11–19.) A person of ordinary skill in the art would recognize that a bulb that includes a DC light-emitting diode module bridging one port of a full-wave bridge rectifier could be used in |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | the device disclosed in McDonough as of the filing date of the application that led to the '163 patent, since such LED bulbs were known as of that date. Notably, nothing in claim 7 (or claim 1) requires that the bulb be dimmable. Regardless, both dimmable and non-dimmable LED bulbs were available, i.e., on sale, in public use or described in publications, prior to the filing date of the application that led to the '163 patent (as discussed below). *Exemplary Non-Dimmable LED Bulbs* Defendants have obtained and made available for inspection on September 28, 2015 a Lights of America prior art device (Model No. 9600LEDBRZSC) that included a non-dimmable LED bulb (2025LEDE12-30K). The 2025LEDE12-30K bulb contains a series connection of 20 LEDs. (HEATH014253–63.) The LEDs are connected using a full wave bridge rectifier, with the addition of resistors to limit the current and a capacitor to reduce the flicker of the bulb. (*See id.*) These bulbs were on sale and/or in public use by at least December 2008. As another example, in its 2008 product catalog, Osram Sylvania offered for sale several non-dimmable "LED Retrofit Lamps." (HEATH014235.) *Exemplary Dimmable LED Bulbs* Megaman Global introduced "Dimming on Random Switches" (DorS) technology for their light saving LED bulbs by at least July 2006. (*See, e.g.*, HEATH013814–15; HEATH013822–26.) Lighting Science Group offered for sale a bulb around May 5, 2009 (before the filing date of the application that led to the '163 patent) that it described as an LED "designed to replace the standard incandescent |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | and compact fluorescent lamps (CFLs) in homes and commercial environments" and that was "available in the most popular standard incandescent lamp or bulb shape – A19." (*See, e.g.*, HEATH013818–19; *see also* HEATH013820–21 ("LSG is the first company to market with a high-output, dimmable, Edison-base LED bulb"); HEATH013837–39 (describing, illustrating and offering for sale LSG's "new Light Emitting Diode (LED) low wattage replacement lamp for the standard incandescent lamp."))<br><br>By at least September 7, 2008, Light Emitting Diode Designs, LLC, began offering for sale both dimmable and non-dimmable LED bulbs. (HEATH013816–17 (catalog) and HEATH013840 (noting 090708 revision date of its latest product catalog.))<br><br>As discussed above regarding the last limitation of claim 1, as of the filing date of the application that led to the '163 patent, it was well-known that LED bulbs have threshold voltages. (*See supra.*)<br><br>As of the filing date of the application that led to the '163 patent, it was known that LEDs only permit one-way conduction of current (*see, e.g.*, C.T. Chen Dep. Tr. at 66:4–5, 102:24–6) but that circuitry or other solutions, such as bridge rectifiers, could be used to permit use of alternating current with such diodes. For example, U.S. Publication No. 2004/0066142 ("Stimac") describes:<br><br>[E]ach electronics module 14, 60, 70 also contains suitable electronic components 80 for converting the input electrical supply power 82 . . . to conditioned output electrical power delivered to the output coupler 52 and adapted for driving the optics module 72. The received input power 82 is conditioned in a step 84. **The conditioning 84 in the case of an a.c. input preferably includes rectification, since LEDs are** |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
| --- | --- |
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | **advantageously driven by a d.c. current.** In one suitable embodiment, a switching power supply of a type known to the art is used for the power conditioning and rectification 84 of an a.c. input power 82, along with optional EMI/RFI filtering. **Of course, the detailed electronics for performing the conditioning 84 depends upon the type of the input power supply and the power output desired for the optics module 12. Those skilled in the art can readily select appropriate electronics and component values therefor to perform the power conditioning step 84.** <br><br> (HEATH002466 ¶ [0038] (emphasis added.))[3] <br><br> As another example, an article published in *LEDs* magazine in 2006 describes that: <br><br> To run an LED-based fixture from a mains supply (e.g. 120 V AC) requires electronics between the supply and the devices themselves to provide a DC voltage (e.g. 12 V DC) capable of driving several LEDs. . . . **There are several options for operating LEDs from an AC power supply**. Many stand-alone LED fixtures simply have a transformer between the wall socket and the fixture to provide the required DC voltage. **A number of companies have developed LED light bulbs that screw directly into standard sockets, but these invariably also contain miniaturized circuitry that converts AC to DC before delivering it to the LEDs. Another approach is to configure the LEDs or die themselves into a DC bridge circuit.** Although AC is input to this LED bridge circuit configuration, the LEDs |

---

[3] Stimac also describes using: an Edison-type threaded connector (*id.* ¶ [0035]), a DMX-512 microcontroller or application-specific integrated circuit (ASIC) (*id.* ¶ [0039]) and dimming (*id.* ¶ [0041]).

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | are still driven with DC and this approach requires more drive power than a "true" AC-LED design.<br><br>(HEATH014267–68 (emphasis added.))<br><br>U.S. Patent No. 7,564,198 ("Yamamoto") discloses Figure 8, below:<br><br><br><br>Yamamoto explains:<br><br>    FIG. 8 is a schematic view showing one embodiment of an LED lighting device according to prior art. In the figure, there are provided a commercial AC source 400; a full-wave rectifier circuit 401 comprised of rectifier diodes $401_1$ to $401_4$ for rectifying the commercial AC source; a current-limiting resistor 402 connected to a plus output terminal A of the full-wave rectifier circuit 401 for limiting a current flowing through an LED array 403 . . .; a capacitor 404 for smoothing an output of the |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
| --- | --- |
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | full-wave rectifier circuit . . . . <br><br> (HEATH014485 at 1:19–34.) <br><br> U.S. Patent No. 7,296,913 ("Catalano") similarly recognizes that one skilled in the art would be familiar with the concept of using a rectifier to convert an AC power source to DC: <br><br>     Electrical power is provided to the light emitting elements 108 via electrical connectors 112 which connect to each light emitting element 108 and to the base 104. . . . Electrically supplied to these electrical connectors 112 can be AC or DC, in the case of AC the necessary control circuitry 115 may be located for converting the AC power to DC power is used. This control circuitry 115 may include resistors, rectifying diodes, and Zener diodes. Rectifying diodes convert AC to DC, should the power source to the LED's be AC. Rectifying diodes are not needed when the power supply is DC. <br><br> (HEATH002506–07 at 4:52–5:11.) <br><br> U.S. Patent No. 7,344,275 ("Allen") also discloses full-wave bridge rectifiers: |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
| --- | --- |
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | Fig. 4  Allen explains: "FIG. 4 shows an example schematic electrical diagram for the AC-to-DC converter employed in both diagrams of FIG. 3. The AC input to the circuit in FIG. 1 is indicated by the symbol for an AC source 401. . . . The actual AC to DC rectification is performed by use of a full-wave bridge rectifier 403. This bridge rectifier 403 results in a rippled DC current and therefore serves as an example circuit only. . . . FIG. 4A shows an alternate example schematic electrical diagram for the AC-to-DC converter employed in both diagrams of FIG. 3 wherein full wave rectification is split, eliminating one wire." (HEATH014462 at 12:11–29.) Allen continues: "A full-wave rectifier may also be used to obtain higher duty factor for the diodes which, without the rectifier, would turn on and off during each AC cycle at an invisibly high rate (e.g., 50 or 60 Hz). The LEDs themselves may be a mixture of any type, including any size, shape, material, color or lens, and the LEDs may have different resistance values. In the preferred (but not necessary) embodiment, the diode network is directly driven from the AC power source, without any form of current-limiting circuitry external to the diode. Specifically, the invention is intended to encompass an arrangement whereby the resistance values of individual LEDs is altered such as with a drop-down resistor disposed in one or more of the LEDs." (HEATH014463 at 14:31–44.) |

36

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | (*See also, e.g.*, U.S. Publication No. 2007/0182338; U.S. Publication No. 2007/0182347; U.S. Publication No. 2008/0258649; and U.S. publication No. 2009/0160369; Kim dissertation at 93 ("A diode bridge rectifier provides full wave rectification of AC voltage to sequential components. Both compact fluorescent and LED lamps require the rectified voltage to produce light output, while incandescent lamps directly generate light output from AC power.")) <br><br> Thus, as of the filing date of the application that led to the '163 patent, one skilled in the art would know that a lighting system, such as that disclosed in McDonough, may accept various types of light bulbs and that a full-wave bridge rectifier could be used in an LED to convert AC to DC power. One skilled in the art would be motivated to combine his/her knowledge that such an LED bulb was available and would be compatible with the device disclosed in McDonough to arrive at this claimed limitation. <br><br> As described above, both dimmable and non-dimmable LED bulbs were known. Further, the desirability of using such bulbs to replace incandescent bulbs was well-known prior to the filing date of the application that led to the '163 patent. For example, U.S. Patent No. 7,296,913 to Catalano describes that "Currently lighting applications are dominated by incandescent lighting products" but that "[l]ight emitting diodes have operating advantages compared to ordinary incandescent as well as halogen lights." (HEATH002492 at 1:21–22, 1:39–40.) Stimac (HEATH002459–68) explains that many commercial mirrored reflector/parabolic aluminized reflector (MR/PAR) lamps existed that were compatible with a wide range of electrical input standards, including 110 V as well as lower voltages such as 6 V or 12 V. (¶ 3.) Stimac continues: <br><br> Those skilled in the art will recognize that the described modular lamp 10 overcomes significant problems which LED lamp manufacturers have previously struggled with. For example, the |

| CHART 2: U.S. PATENT NO. 7,190,125 ("MCDONOUGH") | |
|---|---|
| CLAIM LIMITATION | DEFENDANTS' INVALIDITY POSITION |
| | lamp . . . is suitable for replacing a conventional MR- or PAR-type lamp in a lamp fixture that includes one of a plurality of types of electrical receptacles. The electronic connector module . . . is selected and joined to the optics module 12, either at the factory or by the end user, to form an LED based retro-fit lamp which is installed into the electrical receptacle of the lamp fixture in the usual manner, for example by screwing in the LED-based lamp when using an Edison-type threaded connector.<br><br>(*Id.* ¶ 45.)<br><br>As discussed above, $V_t$ for LED bulbs was well-known.<br><br>Thus, long before Plaintiff filed its patent application, those skilled in the art were familiar (1) with LED bulbs (both dimmable and non-dimmable); (2) the advantages LED bulbs offered over incandescent and other bulbs; (3) that an LED bulb had a threshold voltage $V_t$ that must be met in order to turn on, necessitating the use of a time delay to ensure the LED bulb receives sufficient current voltage to turn on; and (4) known solutions for using LED bulbs in lighting fixtures that typically accept incandescent and other types of then-more-common bulbs. It would have been obvious to one of skill in the art as of filing date of the application that led to the '163 patent to combine the teachings of McDonough with his/her knowledge and/or the above prior art teachings because they all teach similar matters in the narrow field of lighting systems and involve substituting only a limited number of elements for other elements with a predictable result. |

Date: December 15, 2015

/s/ Nicole L. Little
Karl R. Fink (IL 6180508)
krfink@fitcheven.com
Nicole L. Little (IL 6297047)
nlittle@fitcheven.com
FITCH, EVEN, TABIN & FLANNERY LLP
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

*Attorneys for Defendants HeathCo LLC, Lowe's
Companies, Inc. and Lowe's Home Centers, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that the following were served with a copy the above

**DEFENDANTS' FINAL INVALIDITY AND UNENFORCEABILITY CONTENTIONS**

via electronic mail on December 15, 2015:

Grantland G. Drutchas
Drutchas@mbhb.com
Marcus J. Thymian
Thymian@mbhb.com
Nicole A. Keenan
Keenan@mbhb.com
Kirsten L. Thomson
Thomson@mbhb.com
Cole Richter
Richter@mbhb.com
MCDONNELL, BOEHNEN, HULBERT & BERGHOFF
300 South Wacker Drive
Chicago, IL 60606
Phone: (312) 913-0001
Fax:     (312) 913-0002

*Attorneys for Plaintiff Vaxcel International Co., Ltd.*

/s/ Nicole L. Little
Nicole L. Little
*Attorney for Defendants HeathCo LLC, Lowe's
Companies, Inc. and Lowe's Home Centers,
LLC*